

**U.S. Department of Justice**

*United States Attorney*
*District of New Jersey*

---

| | |
|---|---|
| *970 Broad Street, 7th floor*<br>*Newark, New Jersey 07102* | *973-645-2700* |

July 23, 2020

**Via ECF and Electronic Mail**
The Honorable John Michael Vazquez
United States District Judge
U.S. Post Office and Courthouse
Federal Square
Newark, New Jersey 07102

Re:   United States v. Melissa Reynolds, a/k/a "Melissa Shawn Reynolds," a/k/a "Melissa James" (Crim. No. 18-687)

Dear Judge Vazquez:

Please accept this letter in lieu of a more formal submission in response to the Fourth Motion of Defendant Melissa Reynolds, a/k/a "Melissa Shawn Reynolds," a/k/a "Melissa James" ("Defendant"), filed on July 16, 2020 that requests the Court to extend Defendant's self-surrender date to Federal Correctional Institution-Danbury ("FCI-Danbury") from July 31, 2020 to April 30, 2021 based on the COVID-19 pandemic, her role in training other nurses, and family circumstances. The United States respectfully opposes this motion on every ground, and respectfully asserts that Defendant should surrender to FCI-Danbury on July 31, 2020 to begin serving her sentence.

**Factual Background**

On November 14, 2018, Defendant was convicted after pleading guilty to one count of a dual-object conspiracy to commit mail fraud and bank fraud. On December 18, 2019, this Honorable Court sentenced Defendant to a term of imprisonment of one year and one day.

On January 13, 2020, Defendant filed a letter requesting the Court to stagger the sentences of her and her co-conspirator husband, Germaine King, so that so that they could provide care for: Defendant's minor child, G.J., who resided with Defendant and King; King's minor daughter, S.K., who resided with Defendant and King several nights a week; and King's mother, N.F., who resided with Defendant and King. The United States filed an opposition, dated January 23, 2020, noting that Defendant had failed to adequately demonstrate that no alternative living arrangements were available. In reply, King wrote that the reason for the request was due to financial responsibilities. On

January 27, 2020, after reviewing the parties' submissions, this Honorable Court agreed with the United States, and denied Defendant's and King's request for staggered sentences, finding that Defendant and King had failed to demonstrate that alternative living arrangements were not reasonably available. (ECF #99). On January 29, 2020, the Court ordered that the Bureau of Prisons ("BOP") to designate the start of Defendant's sentence pursuant to its regular practice. (ECF #100).

On March 20, 2020, Defendant filed a second motion to extend her surrender date from March 27, 2020 to FCI-Danbury based generally on the COVID-19 pandemic. On March 20, 2020, the Court rescheduled the surrender date to June 1, 2020. (ECF # 102). On May 22, 2020, Defendant filed a third motion to extend her surrender date from June 1, 2020. This motion was also based primarily on the COVID-19 pandemic. With the consent of the United States, this Honorable Court extended Defendant's surrender date to July 31, 2020. (ECF #106).

On July 16, 2020, Defendant filed a fourth motion to extend her surrender date.[1] This Motion is again based on COVID-19, Defendant's work in training nurses, and the purported imminent surgery of Defendant's mother in-law. None of these claims merit an extension of the Defendant's previously-ordered surrender date.

### BOP's Response to the COVID-19 Pandemic

As this Court is well aware, COVID-19 is an extremely dangerous illness that has caused many deaths in the United States in a short period of time and that has resulted in massive disruption to our society and economy. In response to the pandemic, BOP has taken significant measures to protect the health of the inmates in its charge.

BOP has explained that "maintaining safety and security of [BOP] institutions is [BOP's] highest priority." BOP, Updates to BOP COVID-19 Action Plan: Inmate Movement (Mar. 19, 2020), available at https://www.bop.gov/resources/news/20200319_covid19_update.jsp.

Indeed, BOP has had a Pandemic Influenza Plan in place since 2012. BOP Health Services Division, Pandemic Influenza Plan-Module 1: Surveillance and Infection Control (Oct. 2012), available at https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf. That protocol is lengthy and detailed, establishing a multi-phase framework requiring BOP

---

[1] This Motion was filed by new counsel for Defendant and was captioned as a "Motion for Reconsideration." A subsequent letter was filed by defense counsel to acknowledge that the April 30, 2021 surrender date was previously docketed in error, and to retract other representations made in that letter.

facilities to begin preparations when there is first a "[s]uspected human outbreak overseas." *Id.* at i. The plan addresses social distancing, hygienic and cleaning protocols, and the quarantining and treatment of symptomatic inmates.

Consistent with that plan, BOP began planning for potential coronavirus transmissions in January. At that time, the agency established a working group to develop policies in consultation with subject matter experts in the Centers for Disease Control, including by reviewing guidance from the World Health Organization.

On March 13, 2020, BOP began to modify its operations, in accordance with its Coronavirus (COVID-19) Action Plan ("Action Plan"), to minimize the risk of COVID-19 transmission into and inside its facilities. Since that time, as events require, BOP has repeatedly revised the Action Plan to address the crisis.

BOP's operations are presently governed by Phase Seven of the Action Plan. The current modified operations plan requires that all inmates in every BOP institution be secured in their assigned cells/quarters, in order to stop any spread of the disease. Only limited group gathering is afforded, with attention to social distancing to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access. Further, BOP has severely limited the movement of inmates and detainees among its facilities. Though there will be exceptions for medical treatment and similar exigencies, this step as well will limit transmissions of the disease. Likewise, all official staff travel has been cancelled, as has most staff training.

All staff and inmates have been and will continue to be issued face masks and strongly encouraged to wear an appropriate face covering when in public areas when social distancing cannot be achieved.

Every newly admitted inmate is screened for COVID-19 exposure risk factors and symptoms. Asymptomatic inmates with risk of exposure are placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation. In addition, in areas with sustained community transmission, all facility staff are screened for symptoms. Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility on that basis alone. A staff member with a stuffy or runny nose can be placed on leave by a medical officer.

Contractor access to BOP facilities is restricted to only those performing essential services (e.g. medical or mental health care, religious, etc.) or those who perform necessary maintenance on essential systems. All volunteer visits

are suspended absent authorization by the Deputy Director of BOP. Any contractor or volunteer who requires access will be screened for symptoms and risk factors.

Social and legal visits were stopped as of March 13, 2020 and remain suspended at this time, to limit the number of people entering the facility and interacting with inmates. In order to ensure that familial relationships are maintained throughout this disruption, BOP has increased detainees' telephone allowance to 500 minutes per month. Tours of facilities are also suspended. Legal visits will be permitted on a case-by-case basis after the attorney has been screened for infection in accordance with the screening protocols for prison staff.

Further details and updates of BOP's modified operations are available to the public on the BOP website at a regularly updated resource page: www.bop.gov/coronavirus/index.jsp.

In addition, in an effort to relieve the strain on BOP facilities and assist inmates who are most vulnerable to the disease and pose the least threat to the community, BOP is exercising greater authority to designate inmates for home confinement. On March 26, 2020, the Attorney General directed the Director of the Bureau of Prisons, upon considering the totality of the circumstances concerning each inmate, to prioritize the use of statutory authority to place prisoners in home confinement. That authority includes the ability to place an inmate in home confinement during the last six months or 10% of a sentence, whichever is shorter, *see* 18 U.S.C. § 3624(c)(2), and to move to home confinement those elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g). Congress has also acted to enhance BOP's flexibility to respond to the pandemic. Under the Coronavirus Aid, Relief, and Economic Security Act, enacted on March 27, 2020, BOP may "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement" if the Attorney General finds that emergency conditions will materially affect the functioning of BOP. Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 516 (to be codified at 18 U.S.C. § 3621 note). On April 3, 2020, the Attorney General gave the Director of BOP the authority to exercise this discretion, beginning at the facilities that thus far have seen the greatest incidence of coronavirus transmission. As of this filing, BOP has transferred 7,042 inmates to home confinement. *See* Federal Bureau of Prisons, *COVID-19 Home Confinement Information*, *at* https://www.bop.gov/coronavirus/.

Taken together, all of these measures are designed to mitigate sharply the risks of COVID-19 transmission in a BOP institution. BOP has pledged to continue monitoring the pandemic and to adjust its practices as necessary to maintain the safety of prison staff and inmates while also fulfilling its mandate of incarcerating all persons sentenced or detained based on judicial orders.

Unfortunately and inevitably, some inmates have become ill, and more likely will in the weeks ahead. But BOP must consider its concern for the health of its inmates and staff alongside other critical considerations. For example, notwithstanding the current pandemic crisis, BOP must carry out its charge to incarcerate sentenced criminals to protect the public. It must consider the effect of a mass release on the safety and health of both the inmate population and the citizenry. It must marshal its resources to care for inmates in the most efficient and beneficial manner possible. It must assess release plans, which are essential to ensure that a defendant has a safe place to live and access to health care in these difficult times. And it must consider myriad other factors, including the availability of both transportation for inmates (at a time that interstate transportation services often used by released inmates are providing reduced service), and supervision of inmates once released (at a time that the Probation Office has necessarily cut back on home visits and supervision).

Furthermore, as of this filing, notably, no inmates have positive COVID-19 test results at FCI-Danbury.

**Training of Other Nurses**

Defendant claims that she needs to extend her surrender date to continue to work as a nurse training other nurses at NYC Health and Hospitals ("Hospitals"). At the time of sentencing, this Court and the United States were made aware that Defendant's nursing license was set to expire on May 31, 2020, which is now nearly two months ago.

The New Jersey Board of Nursing regulations require that a licensee shall immediately notify the Board of Nursing if he or she is indicted or convicted of a crime involving moral turpitude or a crime adversely relating to his or her practice. *See* New Jersey Administrative Code, Title 13, Law and Public Safety, Chapter 37, §13.37-5.9 (April 20, 2020). A check of the New Jersey Division of Consumer Affairs revealed that Defendant's nursing license status was "ACTIVE" but that there is a "pending matter" before the licensing board. It is not clear whether Defendant has self-reported her conviction, or if she has done so, how much longer she will have an active license in any event.

Notwithstanding Defendant's questionable licensure status, she is clearly not the sole individual able to provide nursing training at the Hospitals. In fact, according to the Hospitals' website, it employs over 8,000 nurses. *See* https://www.nychealthandhospitals.org/nurses4nyc/#:~:text=Nursing%20at%20NYC%20Health%20%2B%20Hospitals,care%20for%20all%20New%20Yorkers. The Hospitals will indeed be able to continue to function without Defendant's presence.

**Family Circumstances**

Defendant asserts that her mother in-law is undergoing physical therapy post-surgery for a microdiscectomy, which is a minimally invasive procedure. *See* https://www.mayoclinic.org/medical-professionals/orthopedic-surgery/news/minimally-invasive-spine-surgery-hit-or-miss/mac-20430468. As indicated *supra*, this Court has previously found that there was a failure to demonstrate that alternative living arrangements were not reasonably available. Additionally, more than ample time - over seven months since Defendant was sentenced in December 2019 - has been afforded for any necessary arrangements to be made for her mother in-law, particularly knowing that her husband was also facing incarceration.

As remains the case, Defendant still has no compelling family circumstances preventing her surrender to FCI-Danbury on July 31, 2020, as previously ordered.

**Conclusion**

For these reasons, the United States respectfully asserts that this Court should deny Defendant's fourth motion to extend her surrender date to Danbury-FCI from July 31, 2020 to April 30, 2021.

Respectfully submitted,

CRAIG CARPENITO
United States Attorney

*Joyce M. Malliet*

By: Joyce M. Malliet
Assistant U.S. Attorney

cc:   Anthony Pope, Esq., via electronic mail
      Daniel J. Carney, Senior U.S. Probation Officer, via electronic mail